UNITED STATES

v.

Lawrence Michael WARGO, 182 52 9813,
Fireman Recruit (E–1), U. S. Navy.

NCM 80 2111.

U. S. Navy Court of Military Review.

Sentence Adjudged 20 Feb. 1980.

Decided 17 March 1981.

LCDR I. D. Warden, Jr., JAGC, USN,
Appellate Defense Counsel.

LT Anne L. MacArthur, JAGC, USN,
Appellate Government Counsel.

Before CEDARBURG, C. J., and SAND-
ERS and BOHLEN, JJ.

BOHLEN, Judge:

Appellant asserts that his plea of guilty
to the unauthorized absence alleged in spec-
ification 2 of Charge I was improvident;
the specification alleges that appellant was
an unauthorized absentee from U. S. Naval
Station, San Diego from 4 October 1979
until 1 January 1980. The argument ad-
vanced is that appellant did not actually

leave the Naval Station until sometime in November 1979 and that, since the Naval Station was in his unit, he could not properly be convicted of an unauthorized absence from his unit when in fact he had not left his unit. Appellate defense counsel concedes that the military judge did discuss with appellant during the inquiry into the providence of his plea the theory of "casual presence," as established in *United States v. Jackson*, 1 U.S.C.M.A. 190, 2 C.M.R. 96 (1952). He argues, however, that this doctrine applies to the termination of an unauthorized absence, rather than to its inception. We agree and will set aside the finding of guilty to specification 2 of Charge I.

During the inquiry into the providence of his pleas, appellant explained that after his unauthorized absence from USS PRAIRIE (AD 15) from 25 June 1979 to 9 August 1979 he was returned to Naval Station, San Diego on legal hold to await the return of PRAIRIE, which was deployed. Appellant was assigned to the Legal Hold Barracks and began working with the First Lieutenant's staff, available for general maintenance duties. The pertinent inquiry follows:

MJ: What was your unit on the 28th of September—excuse me—on the 4th of October 1979?

ACC: The Naval Station, sir.

MJ: Now, was that your unit, the Naval Station, because when you reported in from the UA alleged in Specification 1, you were attached to the Naval Station awaiting the return of the PRAIRIE, or something of that nature?

ACC: Yes. They put me in Legal Hold here on base.

MJ: Was your ship out at sea at this time?

ACC: Yes, sir.

MJ: Now, how exactly did your absence commence this time? This was 4 October. Did you fail to return from leave or liberty, or leave during the working day?

ACC: Sir, I stayed on the Naval Station, but I avoided being actually seen.

MJ: So, on the 4th of October 1979, you were still on board the Naval Station?

ACC: Yes, sir.

MJ: Were you assigned duties to perform during the daytime?

ACC: No, sir.

MJ: What were you doing while you were waiting for the PRAIRIE to return? What did they have you doing, just staying in the barracks?

ACC: Well, sir, when I was in the barracks I was—At the time of my UA you mean, sir?

MJ: I mean just before your UA. Did the people who put you on legal hold put on clean-up type duties or something of that nature?

ACC: Oh, yes, sir. I went out with the First Lieutenant, I was working with.

MJ: But, I take it then on the 4th of October, you didn't go to these duties. You were on board the base, but you weren't performing any military duties; is that correct?

ACC: Yes, sir.

MJ: Where were you staying on the base? Where were you spending your days?

ACC: Mainly from the Legal Hold Barracks to the Library, sir.

MJ: So, you slept in the barracks at night and spent your days in the barracks—excuse me—spent your days in the Library?

ACC: Mainly, sir. If I wasn't in the barracks, I was in the Library.

MJ: Did you have an assigned bunk in the barracks when you would come back—when you had originally been assigned to the Legal Hold Barracks, did they assign you a bunk?

ACC: They didn't actually assign me a bunk, they put in Dorm 3. They said whatever bunk you find open that is yours and that's how I did it.

MJ: Now, did you switch bunks after 4 October? Were you still sleeping—

ACC: No, I was in the same bunk, sir.

MJ: Did anyone come around during any of this time, 4 October to 1 January to see you or ask you who you were?

ACC: No, sir. They seen me. A few of the MAA's over there seen me, but nobody ever asked me who I was or what I was supposed to be doing.

MJ: Did you feel you were just a face in the crowd and nobody really noticed?

ACC: Mainly, yes, sir.

MJ: Do you feel that your presence on the base was what could be considered a casual presence, that is, you were here, but you weren't doing any duties and just—

ACC: It was casual, I guess, sir. I was here. I wasn't really assigned any duties. I didn't have any musters or anything like that that I had to be there for or nothing like that, sir.

MJ: Did you carry this casual presence out for the whole period, 4 October through 1 January, or did you leave the base at some point in time?

ACC: No, sir, I carried it on for about a month like that, sir.

MJ: Then what did you do?

ACC: Everything—I just left. I was living out here in San Diego.

MJ: So, after about a month, around in November, you left the base?

ACC: Yes. After about a month, I left.

MJ: When you left, you went out into town?

ACC: Yes, sir.

MJ: San Diego? National City? What town?

ACC: San Diego, sir.

MJ: Did you feel that you had authority from anyone competent to give you that authority to not perform regular military working day type of duty during this presence on board the base?

Did you feel what you were doing was authorized by anybody?

ACC: I wouldn't say it was authorized, sir. No, it wasn't, sir. I wouldn't say it was authorized.

MJ: The period of time when you left the base then, around November, did anybody give you permission to do that?

ACC: No, sir.

MJ: Do you feel in your own mind that you are, in fact, or were, in fact, an unauthorized absentee from the Navy or from the Naval Station from 4 October 1979, until 1 January 1980?

ACC: Yes, sir.

MJ: Do you feel that by your conduct and by your leaving the base, both the conduct of avoiding working details and avoiding military duties and by leaving the base that you were an unauthorized absentee from the Naval Station for that entire period, even though for some periods of it you were on board the base?

ACC: Yes, sir.

MJ: Was there anything in the nature of a physical illness or physical disability which would prevent you from returning sooner if you had wanted to?

ACC: No, sir.

MJ: Did anytime between the 4th of October 1979, and 1 January 1980, did you have any contact with military authorities who were aware that you were an unauthorized absentee?

ACC: No, sir.

MJ: Did you have any contact with civilian authorities who were aware you were an unauthorized absentee?

ACC: No, sir.

MJ: How did your absence terminate?

ACC: I was brought in by the Police, local police—San Diego Police, brought back to the base.

MJ: Did you turn yourself in to them or did they apprehend you?

ACC: It was like apprehension—in a way, I turned myself in. Once they knew my name, I didn't give them any hassle or nothing. I answered their questions. They asked me if I was UA and I said yes. They brought me back to the base. (R.17–21).

It is beyond cavil that the offense of unauthorized absence is committed the instant the absence begins; it is not a continuing offense. *United States v. Lovell*, 7 U.S.C.M.A. 445, 22 C.M.R. 235 (1956); *United States v. Emerson*, 1 U.S.C.M.A. 43, 1 C.M.R. 43 (1951); *United States v. Mors-*

*field*, 3 M.J. 691 (N.C.M.R.1977). Apparent from the colloquy between the military judge and appellant is the fact that on 4 October 1979 appellant had not physically left the confines of the unit he was alleged, in specification 2 of the first charge, to have absented himself from, the Naval Station, San Diego. It is therefore clear that at the time the unauthorized absence was alleged to have occurred, and for "about a month" thereafter, appellant was not physically absent from the unit alleged. He may have been absent from his assigned place of duty on 4 October 1979, or if he missed an assigned watch he may have been derelict in his duties, *United States v. McCreary*, No. 80 2457 (N.C.M.R. 21 Nov. 1980), but he was not charged with these offenses, which are distinct from the offense he is alleged to have committed. *See generally United States v. Sears*, 22 C.M.R. 477 (C.G.B.R. 1956); *United States v. Bieganowski*, 12 C.M.R. 815 (A.F.B.R.1953).

▆▆▆ To be sure, the "gravamen of the offense charged is unauthorized absence from military duties." *United States v. Vidal*, 45 C.M.R. 540, 543 (A.C.M.R.1972). Appellant was absent from his military duties, spending his time between his rack in the barracks and the base library, all the while consciously avoiding his duties with the First Lieutenant's office. In this sense, appellant was but casually present as the term had been used by military courts these many years. *See United States v. Jackson, supra; United States v. Self*, 35 C.M.R. 557 (A.B.R.1964); *United States v. Connor*, 3 C.M.R. 541 (A.F.B.R.1952). Appellant was *present*, however, when the offense was alleged to have occurred, 4 October. It is one thing to theorize about "casual presence" when discussing the termination of an unauthorized absence, when all that is at stake is the question of duration for purposes of aggravation. *United States v. Lovell, supra*. It is yet another matter to discuss the theory vis-a-vis the very essence of the offense—its inception. A member of the armed forces can not be absent from his unit when in fact he is at present, albeit "casually". As we said in *United States v. Barbour*, No. 80 0497 (N.C.M.R. 30 June 1980):

When an accused is not present at his organization during a period when he is required to be there, he may be an unauthorized absentee even though he does not leave the military installation on which the organization is located. His mere presence on base is not the equivalent of his presence with his unit.... Here, however, appellant's organization was the installation and by never leaving the latter he could not absent himself from the former.

(Slip opinion at 2) (citations omitted). *See also United States v. McCreary, supra. Cf. United States v. Grant*, No. 80 1168 (N.C. M.R. 22 December 1980). Moreover, it is our opinion that given appellant's record, having already been declared an absentee once before, the authorities were sufficiently on notice to raise appellant's presence on base "to a level that was more than casual presence." *United States v. Moore*, No. 76 2042 (N.C.M.R. 10 Aug. 1977) (slip opinion at 3). The military judge was therefore in error when he accepted appellant's guilty plea, even though he discussed the offense with appellant in terms of "casual presence;" by doing so he indulged in a logically inconsistent fiction. *See generally United States v. Newton*, No. 80 0680 (NCMR 20 Nov. 1980).

▆▆▆ Accordingly, we set aside the finding of guilty to specification 2 of Charge I. The remaining findings of guilty, to an unauthorized absence from PRAIRIE covering the period 24 June 1979 to 9 August 1979 and to a multiplicious specification alleging that appellant negligently missed movement of PRAIRIE on 30 June 1979, are affirmed as approved on review below. The officer members sitting as a special court-martial sentenced appellant to discharge from the Naval service with a bad-conduct discharge. Upon reassessment, considering the gravity of these remaining offenses, his three prior nonjudicial punishments as well as the fact that the unauthorized absence was terminated by apprehension, we consider the sentence imposed to

remain appropriate and it, too, is therefore affirmed.

Chief Judge CEDARBURG and Judge SANDERS concur.